IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

| | | |
|---|---|---|
| ROBERT MOSER, | * | |
| | * | |
| Plaintiff/Counterclaim Defendant, | * | |
| | * | |
| vs. | * | No. 4:12-cv-00607-SWW |
| | * | |
| | * | |
| UNITED STATES OF AMERICA, | * | |
| | * | |
| Defendant/Counterclaim Plaintiff. | * | |

OPINION AND ORDER

Robert Moser brings this action for refund and abatement of trust fund recovery penalties assessed against him by the Internal Revenue Service (IRS) under 26 U.S.C. § 6672 concerning unpaid federal taxes withheld by MDH Builders, Inc. (MDH) for the second and third quarters of 2009. The United States has counterclaimed for the unpaid trust fund recovery penalties, claiming there is an unpaid balance of $48,041.77 for the second quarter of 2009 (ending June 30), and an unpaid balance of $63,057.65 for the third quarter of 2009 (ending September 30).

The matter is before the Court on motion of Moser for summary judgment [doc.#35]. The United States has responded in opposition to Moser's motion and Moser has filed a reply to the United States' response. For the reasons that follow, the Court denies Moser's motion for summary judgment.

I.

MDH was a construction company owned 100% by Mike Hill. Hill served as the

president of MDH and Moser served as MDH's vice president and construction manager. MDH went out of business in 2009 and Hill filed for bankruptcy.

At its peak in 2006, MDH had $55 million in annual revenues. Subsequently, however, MDH began to experience cash flow problems (apparently as a result of the financial crisis in 2008) and, according to Hill, was forced to choose between paying its subcontractors to keep its projects moving forward lest "the jobs shut down and everything implodes" or pay its payroll taxes. In this respect, while MDH collected payroll taxes from its employees, in six quarters of 2008 and 2009 MDH failed to pay those taxes to the IRS. At issue is whether, pursuant to 26 U.S.C. § 6672, Moser was a "responsible person" and acted "willfully" in failing to pay over trust fund taxes for the second and third quarters of 2009.[1]

Moser states that although he was vice president of MDH and had check signing authority, he had no significant role in the company's tax planning. In support of this claim, Moser has submitted several affidavits from MDH employees stating that Moser did not have significant decision-making authority over MDH's tax matters.

Mike McNew, MDH's comptroller, states that Moser did not have authority to decide independently that MDH funds should be disbursed for any purpose except for projected related expenses. He states that all invoices were reviewed and approved for

---

[1] The United States also brought a third-party complaint against Hill seeking unpaid trust fund recovery penalties. The United States and Hill subsequently consented to judgment against Hill for, *inter alia*, unpaid liabilities assessed against him under 26 U.S.C. § 6672 for the tax periods ending March 31, 2008, September 30, 2008, December 31, 2008, March 31, 2009, June 30, 2009, and September 30, 2009, in the amount of $468,815.48. See Doc.#14.

payment by a project manager and sent to the accounting department for future checks to be issued and that these checks were signed by Moser as a convenience and as an audit function.  McNew states that Moser did not prepare any payroll tax returns or discuss any payroll tax issues with the IRS, he never participated in a formal company strategy session about the payroll tax liability, and that in his role in the company, he did not have the authority  to fail willfully  to disburse any funds in avoidance of the payroll tax obligations.

Similarly, Sharon Bryant, an assistant project manager for MDH, Sheilia Colclasure, who worked in MDH's accounting department, Stuart Brent, who worked for MDH doing marketing and project managing, and Valerie Culbreath, a project manager assistant for MDH, all state that Moser's primary responsibility at MDH was managing construction projects and construction managers but that Moser had no financial control over the company, that he had no authority to operate, develop or administer the financial policy of the company, that his signing of any checks was as a convenience and audit function, that he did not prepare any of the company's payroll tax returns, that he did not have authority to decide independently that company funds should be disbursed for any purpose, and that in his role in the company, he did not have the authority to fail willfully to disburse any funds in avoidance of the payroll tax obligations.  In addition, Amy Atterberry, who worked in accounting for MDH, states that to her knowledge, Moser did not prepare any of MDH's payroll tax returns.

Hill likewise testified in his deposition that Moser "didn't have the authority to

make the call on not paying the taxes" after August 2008.  In this respect, Hill testified
that in August 2008, his outside Certified Public Accountant (CPA) notified him that
there was a payroll tax issue and that he immediately contacted Moser and McNew to
discuss the issue.  Hill states that he clarified to McNew that he no longer had to take
direction from Moser when it came to "stuff" like unpaid payroll tax liability, noting that
after August 2008, Moser was not in a position to direct MDH not to pay its taxes.

However, Hill also testified that Moser remained vice president of MDH, that all
his other responsibilities remained intact, that Moser had the authority to prioritize which
of MDH's creditors were paid when money was tight, and that Moser "was part of the
decision process" of deciding to pay MDH's subcontractors instead of paying MDH's
payroll taxes (at least prior to August 2008).  Hill testified as follows:

> Q. Was it a big secret in the office that this payroll tax issue was ongoing?
>
> A. I don't think it was a big secret. I just -- I was not in -- I was not in the
> middle of that particular decision that happened, I guess it was August or
> maybe it happened in -- I don't know when it happened, but I wasn't in that
> conversation.  Like I said, I found about it through our CPA.
>
> Q. Okay. That was a decision that was made between McNew and Moser,
> to start paying net payroll; is that fair?
>
> A. That would be fair. Yes.
>
> Q. Now, subsequent to August 2008, there isn't any question the company
> continued to pay creditors. Correct?
>
> A. Correct. There was -- you know, there was always -- the cash -- yes, for
> the most part, yes.
>
> Q. I mean, the company kept operating; correct?

A. Correct.

In addition, Hill, in protesting the assessment of penalties against himself,

informed the IRS in May 2011 that it was Moser who made the decision to divert funds

that had been set aside to pay trust fund taxes and instead pay those same funds to

subcontractors and suppliers.  Hill testified as follows:

Q. Mr. Hill, do you recognize your signature on the second page of this document?

A. I do.

Q. And does this appear to be a letter that you wrote to Mr. [Willie] Howard [IRS's Compliance Services department] regarding the trust fund penalties in this case?

A. Correct.

Q. Okay. At the bottom here I'm going to read a line from this letter that you wrote. You tell me if I read this correctly. "Robert Moser and Michael McNew made the final decision on all matters related to the payment of funds from the company on a day to day basis." Did I read that correctly?

A. You did.

Q. And the next paragraph reads. "Robert Moser in his capacity as VP-Operations made the decision to divert funds that had been set aside to pay Trust Fund Taxes and instead pay those same funds to subcontractors and suppliers against the outspoken objection of the CFO (Michael McNew) of MDH Builders, Inc." Did I read that correctly?

A. You did.

Q. Now, is that -- can that be reconciled with your testimony today, is that the conversation that you are talking about when Mr. McNew and Mr. Moser made this decision to --

A. Correct.

Q. -- pay subs instead of the taxes?

A. Correct.

Q. Okay. Now, the next sentence, if you flip to next page, you wrote in May 11, May 2011, "Robert Moser alone made the decision not to pay the Trust Fund Taxes and hid this fact from me nearly one year."

A. I don't know if the timing on that is accurate. Like I said, Moser, his job was to keep the jobs going, and his thought process was, if we didn't keep the jobs going, it wouldn't matter anyway, everything was going to go down. McNew, knowing the severity of having to pay trust fund taxes and how important it was, urged -- urged Moser to pay -- we need to be paying the taxes and Moser was like, I've got to keep the jobs going. It was a -- and they had a lot of conflicting -- they had a lot of conflict between them. I mean, it was kind of a hate/hate relationship. And I don't -- the only thing I'm not a hundred percent sure about is the year. I don't know that it was long when we all of that occurred.

Moser, however, states that Hill later disavowed his representations to the IRS regarding Moser's culpability as his attempt to wriggle his way out of the tax liability MDH had incurred. Hill testified as follows:

Q. That [letter] was after Willie Howard had decided to assess the unpaid taxes against you; is that correct?

A. Yes, sir.

Q. Okay. And the purpose of this letter was to protest the assessment; is that correct?

A. Yes.

Q. And at that time were you trying to get – get it assessed against Robert instead of you, Robert Moser? You can reread the letter if you need to.

A. Well, it reads that way. The main focus of it was, you know, letting the IRS know that, you know, I wasn't involved in the decision that got it started, and then the company crumbling got me in the position where we

couldn't take care of the obligation.  But it – anyway.

Q. So was your intent when you wrote this to take liability away from you and instead put it on Robert?

A. No, I wasn't necessarily trying to put it on Robert.  I was basically trying to, I guess limit the liability on me.

Q. Okay.  Would you agree that this letter implicates Mr. Moser being the responsible party for not paying the withholding taxes at MDH?

A. It has that tone, yes.

Hill also testified that he "would assume" that Moser would "had to have known" that MDH wasn't paying their payroll taxes and he acknowledged that he didn't have any direct knowledge as to how and when Moser would have found out that the payroll taxes weren't paid.  Moreover, in contrast to the affidavits of McNew, Bryant, Colclasure, Brent, Culbreath, and Atterberry, Jeremy Thompson, one of MDH's project managers, testified that Moser had the authority to direct payment of trust fund taxes to the IRS:

Q. In your opinion based on the decision-making authority at MDH, who in your mind would have the authority to decide whether payroll taxes were paid over to the IRS?

A. Based on my knowledge with, you know, getting issues resolved on my jobs and such, those three folks: Mike Hill, I would think Robert, and Mike McNew would have seen -- they would have had to have seen at some point, you know, what was available from the jobs coming in and had to make those hard choices. I know that they cut checks for our subs and suppliers; I can only assume the other administrative fees and so on and so forth, they would be a part of that.

The United States has also submitted checks to numerous creditors and vendors other than the IRS that Moser signed after he was aware that MDH was failing to pay its

payroll taxes, and Moser acknowledges that he signed payroll checks–including his

own–after he was aware that MDH was failing to pay its payroll taxes that reflected "net"

wages (although he appears to claim that it was McNew's doing):

> Q. And on the top right-hand corner do you see a check made out to Robert Moser?
>
> A. Yes, I do.
>
> Q. And that is your signature; correct?
>
> A. It is my signature.
>
> Q. And what's the amount?
>
> A. 4,615.38.
>
> Q. Any recollection as to what this check would have been for?
>
> A. That would have been a payroll tax -- I mean a -- sorry, doesn't say any of that. That was a payroll check without taxes being held. That's what Mike McNew started doing, evidently with me, him and Mike McNew and Mike Hill.
>
> Q. So, that's what I was going to ask you, because it looked to me like there's a lot of employee names on some of these checks, so these are essentially payroll checks; correct?
>
> A. That is correct.
>
> Q. So the company was paying net payroll without paying over any withholding taxes to the government?
>
> A. Yeah, I think that's -- yeah.

In addition, Moser, although having the authority to prioritize which of MDH's

creditors were paid when money was tight, acknowledged that he never as vice president

directed that MDH's payroll tax liabilities be paid prior to payment of MDH's other obligations, such as subcontractors.

## II.

Moser moves for summary judgment on grounds that he did not have the actual authority to direct payment of MDH's payroll taxes or decide whether the company's payroll taxes were paid. Moser argues no reasonable jury would find that he is liable for the taxes owed by MDH and Hill and therefore summary judgment should be granted in his favor.

## A.

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(a). To support an assertion that a fact cannot be or is genuinely disputed, a party must cite "to particular parts of materials in the record," or show "that the materials cited do not establish the absence or presence of a genuine dispute," or "that an adverse party cannot produce admissible evidence to support the fact." Fed.R.Civ.P. 56(c)(1)(A)-(B). "The court need consider only the cited materials, but it may consider other materials in the record." Fed.R.Civ.P. 56(c)(3). The inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986) (citations omitted). Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. *Reeves v.*

*Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (citation and quotation marks omitted).  However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  *Matsushita,* 475 U.S. at 587 (citation omitted).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "Factual disputes that are irrelevant or unnecessary will not be counted."  *Id*.

B.

In *Dintleman v. United States*, No. 3:07-cv-00081-SWW, 2010 WL 78182 (E.D. Ark. Jan. 7, 2010), this Court set forth the applicable statutory background and legal standards for actions under 26 U.S.C. § 6672 as follows:

> The Internal Revenue Code requires employers to withhold income and Federal Insurance Contribution Act ("FICA") taxes from the wages of employees, when those wages are paid.  *See* 26 U.S.C. §§ 3102(a), 3402(a). Withheld amounts, commonly referred to as trust fund taxes, "shall be held to be a special fund in trust for the United States," *see* 26 U.S.C. § 7501, and the willful failure to pay over trust fund taxes to the United States subjects a responsible person to personal liability.  *See* 26 U.S.C. § 6672.

> Title 26 U.S.C. § 6672(a) provides in pertinent part as follows:

> Any person required to collect, truthfully account for, and pay over any tax imposed by this title who willfully fails to collect such tax, or truthfully account for and pay over such tax, or willfully attempts in any manner to evade or defeat any such tax or the payment thereof, shall, in addition to other penalties provided by law, be liable to a penalty equal to the total amount of the tax evaded, or not collected, or not accounted for and paid over.

-10-

Section 6672(a) imposes liability on *any* person, also known as a "responsible person," who is under a duty to collect, truthfully account for, *or* pay over taxes. *See Slodov v. United States*, 436 U.S. 238, 249, 98 S. Ct. 1778, 1786 (1978) (holding that a "responsible person" is one who has a duty to perform at least one of the three functions listed under § 6672). Furthermore, § 6672(a) imposes joint and several liability, so more than one person may be a "responsible person" subject to liability.

\* \* \*

Section § 6672 imposes liability when two requirements are met: (1) the person must be a "responsible person," and (2) the person must act "willfully" in failing to pay over trust fund taxes. *See Ferguson v. United States*, 484 F.3d 1068, 1072 (8th Cir. 2007).

\* \* \*

## A. Responsible Person

A "responsible person" under § 6672 is someone who has "'the status, duty and authority to avoid the corporation's default in collection or payment of taxes.'" *Id*. (quoting *Barton v. United States*, 988 F.2d 58, 59 (8th Cir. 1993) (quoting *Kenagy v. United States*, 942 F.2d 459, 464 (8th Cir. 1991)). "As the case law makes abundantly clear, a person's 'duty' under § 6672 must be viewed in light of his power to compel or prohibit the allocation of corporate funds." *Godfrey v. United States*, 748 F.2d 1568, 1576 (Fed. Cir. 1984). Signs of a "responsible person" in this context include holding a corporate office, control over financial affairs, the authority to disburse corporate funds, stock ownership, and the ability to hire and fire employees. "[W]here a person has authority to sign the checks of the corporation, or to prevent their issuance by denying a necessary signature, or where that person controls the disbursement of the payroll, or controls the voting stock of the corporation, he will generally be held 'responsible.'" *Godfrey,* at 1576 (internal citations omitted). On the other hand, whether a person is responsible is a matter of substance, not form. *Id*. To trigger liability under § 6672, a person must have significant decision-making authority over the corporation's tax matters, and a person's technical authority to sign checks and duty to prepare tax returns are not enough to make the person responsible under § 6672. *See Kenagy v. United States*, 942 F.2d 459, 464 (8th Cir. 1991).

\* \* \*

**B.  Willfulness**

A  "responsible person" acts willfully if he or she "'acts or fails to act consciously and voluntarily and with knowledge or intent that as a result of his [or her] action or inaction trust funds belonging to the government will not be paid over but will be used for other purposes, or by proceeding with a reckless disregard of a known or obvious risk that trust funds may not be remitted to the government.'"  *Ferguson v. United States*, 484 F.3d 1068, 1072-73 (8th Cir. 2007) (quoting *Keller v. United States*, 46 F.3d 851, 854 (8th Cir. 1995) (quoting *Honey v. United States*, 963 F.2d 1083, 1087 (8th Cir. 1992)).

*Dintleman*, 2010 WL 78182 at \*1-5 (emphasis in original).

1.

The core question in determining whether Moser qualifies as a responsible person is whether he had the power to control the decision-making process by which MDH allocated funds to other creditors in preference to its withholding tax obligations. *Dintleman*, 2010 WL 78182 at \*4 (citing *Haffa v. United States*, 516 F.2d 931, 936 (7th Cir. 1975)).  Although Moser has presented evidence showing that after August 2008, he didn't have the authority to allocate funds to other creditors in preference to its withholding tax obligations, the United States has submitted evidence showing that it in fact was Moser who made the decision to divert funds that had been set aside to pay trust fund taxes and instead pay those same funds to subcontractors and suppliers.  Viewing the inferences to be drawn from the underlying facts in the light most favorable to the United States, the Court cannot determine, as a matter of law, that Moser was not a responsible person under 26 U.S.C. § 6672.  Rather, determining whether Moser was a responsible

person will involve credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts that are jury functions and not those of a judge. *Reeves*, 530 U.S. at 150.

2.

Concerning willfulness, "'[e]vidence that the responsible person had knowledge of payments to other creditors, including employees, after he was aware of the failure to pay over withholding taxes is proof of willfulness as a matter of law.'" *Dintleman*, 2010 WL 78182 at *5 (quoting *Olsen v. United States*, 952 F.2d 236, 240 (8th Cir.1991)).  Here, Moser acknowledges that after he was aware that MDH was failing to pay its payroll taxes, he signed payroll checks (including his own) that reflected "net" payroll, *i.e.*, paying net payroll without paying over any withholding taxes to the IRS, and the United States has presented evidence that Moser also disbursed funds to creditors other than the IRS after that time.  Viewing the inferences to be drawn from the underlying facts in the light most favorable to the United States, the Court cannot determine, as a matter of law, that Moser did not willfully fail to pay over trust fund taxes.

III.

For the foregoing reasons, the Court denies Moser's motion for summary judgment [doc.#35].

IT IS SO ORDERED this 27th day of May 2014.

/s/Susan Webber Wright
UNITED STATES DISTRICT JUDGE

-13-